UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

Case No. 3:24-cv-960

| | |
|---|---|
| ANGELIA NIKOLE JAMES, | |
| Plaintiff, | |
| v. | **COMPLAINT** |
| THE CITY OF MONROE, a North Carolina municipal corporation, | [JURY TRIAL DEMANDED] |
| Defendant. | |

1.      Amotion is a common law procedure that permits the governing body of a municipality to remove one of its elected members by simple majority vote. The use of amotion is exceedingly rare; it "has been and should be limited to extraordinary circumstances, for setting aside a decision of the electorate is not a light [matter]." *Berger v. New Hanover Cnty Bd of Comm'rs*, 2013 NCBC 45 *56 (Super. Ct. New Hanover Cnty. Sept. 5, 2013).

2.      On November 9, 2021, the City Council (the "Council") of the City of Monroe (the "City") voted to initiate amotion proceedings against Plaintiff Angelia James, a City Councilmember. In doing so, the Council specifically instructed the City Attorney to incorporate references to statements that James made at press conferences—statements in which James (who was running for mayor), criticized public officials, including her political opponents.

-1-

3.     On the basis of its decision to initiate removal proceedings against James, the City subjected James to a two-day, public evidentiary hearing that ultimately culminated in a vote to remove her from office.  In this way, the City overrode the votes of 1,200 of its residents and stripped its only black City Councilmember of her office.

4.     The City's decision to initiate removal proceedings against James and, ultimately, to remove James from office, was government retaliation for protected speech and was motivated by racial discrimination in violation of James's rights under the Fourteenth Amendment to the U.S. Constitution.

5.     The City's decision to initiate removal proceedings against James and, ultimately, to remove James from office was also founded on an unconstitutionally vague and overbroad Code of Ethics.

6.     James lost her seat on City Council because of the City's retaliatory and discriminative decision making.  She has suffered serious injuries beyond the loss of her seat, including reputational injury and damage to her political career.  This action follows.[1]

<u>PARTIES</u>

7.     Plaintiff Angelia Nikole James is a citizen and resident of Union County, North Carolina.

---

[1] James filed her first complaint and petition for writ of certiorari concerning this conduct on April 23, 2022.  On August 28, 2024, after the November 2023 election mooted James's claims for reinstatement and request for certiorari review, James took a voluntary dismissal without prejudice of her complaint and petition for certiorari review.

8.     Defendant City of Monroe is a North Carolina municipal corporation situated in Union County, North Carolina organized and governed by North Carolina law.

## JURISDICTION & VENUE

9.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because some of the claims alleged arise under federal law.

10.     The Court has jurisdiction over Defendant pursuant to N.C. Gen. Stat. § 1-75.1 *et seq.* and may exercise such jurisdiction in a manner consistent with the requirements of due process.

11.     Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## WAIVER OF IMMUNITY

12.     The City does not have immunity from James's claims under 42 U.S.C. § 1983.  To the extent the City would otherwise have immunity from suit or liability for those claims or any other claims alleged herein, the City has waived that immunity through the purchase of insurance pursuant to N.C. Gen. Stat. § 160A-485(a) or through participation in a local government risk pool within the meaning of N.C. Gen. Stat. § 160A-485(a).

## FACTS

### I.     The Council's Structure and Power

13.     With a population of 36,392, the city of Monroe is the seat of Union County, North Carolina.

-3-

14.     The City operates under the council-manager form of government.  Its City Council appoints a city manager to serve as the City's chief administrative officer and oversee the day-to-day operations of the City, including personnel decisions.

15.     The Council consists of six councilmembers and the mayor, who has a vote on all matters before Council.[2]  The Council is responsible for the general governance of the City, including policy decisions and "mak[ing] sure the budget is balanced."

16.     The Council can only engage in official acts at open meetings, with a quorum present, and with majority vote of the Council.

17.     Similarly, a City Councilmember has no power to act unilaterally on behalf of the City.

18.     Other than the City Manager, the City Attorney, and the City Clerk, the Council does not hire, fire, demote, promote, or supervise any employee.

II.     **September 9, 2021 Events**

19.     Over 1,200 people elected James to the office of City Councilmember in November 2019. She took office the next month.  Her term was supposed to last until December 2023.

20.     Until December 2021, when the newly elected councilmembers were sworn into office, the Council comprised Mayor Bobby Kilgore, Mayor Pro Tempore Marion Holloway, Franco McGee, Surluta Anthony, Angelia James, Lynn Keziah,

---

[2] Phase 1 took place over two days on January 27 and January 28, 2022 and the transcripts from each day of the Phase I hearing are included as Exhibit A and Exhibit B respectively.

-4-

and Freddie Gordon. In December 2021, after the swearing in of the newly elected Councilmembers, the Council comprised Mayor Marion Holloway, Mayor Pro Tempore Gary Anderson, Freddie Gordon, Lynn Keziah, Angelia James, James Kerr, and Julie Thompson.

21.    In 2021, then-Mayor Bobby Kilgore announced that he would not seek reelection that fall. James decided to run to replace him.

22.    Two other candidates entered the race with James: then-Mayor Pro Tempore Marion Holloway and Bob Yanacsek.

23.    On September 9, 2021, James was in the middle of that mayoral campaign and had an interview with a reporter from the Enquirer Journal, a local newspaper. She met the reporter at a café.

24.    After leaving the café an hour later, James had calls and meetings, including a call with Monroe Police Department ("MPD") Chief of Police, J. Bryan Gilliard. During this talk with Chief Gilliard, James told Chief Gilliard she thought he should retire in May 2022.

25.    Later that day, James went to the Fairfield Inn and Suites in Monroe (the "Fairfield Inn"). She took her youngest son with her. When she arrived, she asked if they had a room available. The clerk told her they did not. At this point, James began getting the sensation that God was speaking to her and telling her that there were "felons" at the Fairfield Inn.

-5-

26.     In the lobby, a man with a hard hat and mask walked by; James approached him and asked him to remove his mask, thinking she knew him. She did not know him.

27.     James began to feel unsafe, so she called Chief Gilliard. She asked him to send someone to check out the hotel because she thought there were felons there.

28.     MPD Police responded, but not because of that call; instead, police responded when the clerk called to complain about James accusing hotel guests of being felons.

29.     When police arrived on the scene, James told them there were felons in the hotel. She insisted that police go hotel room to hotel room to check. She insisted that police arrest felons in the hotel. The officers on the scene largely ignored her demands.

30.     While at the Fairfield Inn, James had the following interactions with the police:

        a.     James told Officer Ragan Broome, a white female police officer, that she was "uppity," Broome needed to "change her character and her facial expressions," Broome had poor body language, James was a Councilmember who deserved respect, and that going to Weddington High School, Broome's alma mater, did not mean anything.

        b.     James told Officer Brantley Birchmore that he was promoted or was going to be promoted to Captain.

-6-

c.      James told Captain Rhett Bolen that he was a "Captain for now," and, after Captain Bolen asked her three times if she wanted his badge, James reached for Captain Bolen's badge, and he brushed her hand away.

d.      James expressed to Captain Bolen that she thought he "don't like black people."

e.      James told various officers that they were fired or demoted or were going to be fired or demoted.

31.    James's husband eventually arrived, and she went home with him, but the two of them argued: James's husband wanted to take their younger son to visit their older son in Matthews, North Carolina. James wanted her husband to stay home.

32.    For help, James called MPD Lieutenant Monique Holt, an officer with whom James had a good relationship. Lieutenant Holt responded, but on the way to James's house, was in a car accident. So, the same police officers that James had interacted with at the Fairfield Inn were dispatched to James's home.

33.    When they arrived at her home, James told these police officers that she had replaced Chief Gilliard with Mark Isley, another police officer. James told the officers that if they did not like Mark Isley, then they would not last long as Monroe police officers.

34.    James began having chest pain and nausea, so police called an ambulance.

35.     First responders convinced James to go with them to Atrium Union hospital in Monroe.

36.     When she arrived at Atrium Union, James continued to tell officers that they were or are going to be fired.

37.     She encountered Officer Kendall Aycoth, who attempted to usher her into a private room.  James resisted, pulling Officer Aycoth's facemask so that the straps broke.

38.     Hospital staff sedated James. They had her involuntarily committed.

39.     James was diagnosed that evening with "acute psychosis."  She was released the next day.

40.     None of the more than half-dozen police officers that interacted with James or witnessed James's behavior on the evening of September 9 charged James with any crime.

III.    **James's Statements to the Media**

41.     Over the next several days and weeks (amid her campaign against Holloway for mayor), James gave several statements to the press.

42.     On or around September 13, 2021, James told the Charlotte Observer that the officers lied about the events of September 9.

43.     During a September 16 press conference with WBTV that was carried by local television networks and posted on James's personal Facebook page, James:

        a.      Discussed a conversation she had with Holloway after a mayoral debate where James told him she thought he was unethical and was engaging

-8-

in activity in violation of N.C. Gen. Stat. § 14-243 because his business, Holloway's Music (U.S. Music, Inc.), has a contract with the City of Monroe where he was personally profiting;

b. Discussed how she told then-City Attorney Mujeeb Shah-Khan about Holloway's contract with the City of Monroe, but he took no action;

c. Expressed her opinion that Kilgore should call a special meeting to discuss firing Mujeeb Shah-Khan as City Attorney because he turned a blind-eye to Marion Holloway's actions;

d. Expressed her opinion that Kilgore and Holloway should step down from their seats because "they're not doing anything for the city of Monroe but being corrupt. And corruption will not be here in the City of Monroe;"

e. Expressed her opinion that people should not vote for Anderson, Thompson, Kerr, or certain other individuals running for city council "because they're in cahoots with Marion Holloway."[3] "Do not vote for them when election comes up November 2nd." "Let's show Monroe that we're bigger than this and they're not going to take us down and they're not going to shut us up;"

---

[3] Holloway, Thompson, Kerr, and Anderson (the latter of whom failed to gain more votes than James in the November 2019 election) ran a group campaign where they labeled themselves as candidates "For All of Monroe." *See* For All of Monroe, Stewards of the Past, steering into the future, Facebook page, https://m.facebook.com/profile.php?id= 100075867642916&_rdr (last visited April 21, 2022). All those candidates would eventually vote in favor of James's removal.

-9-

f.      Expressed her opinion that the series of events after September 9 and 10 were happening to her because she "called out" Holloway for having a contract with the City, which she believed to be a misdemeanor under North Carolina law;

g.      Expressed her opinion that "they are coming for her" because of the information she knows about Holloway and his business's contract with the City; and

h.      Expressed the opinion that Council's reaction was less about the events of September 9 and more because she is a black woman and the city council members were scared to lose their power and control to a black woman.

44.     During a September 17 interview with "Fox 46 Charlotte," James:

a.      Expressed her opinion that it was inappropriate for Holloway, as an elected official, to be doing business with the City of Monroe;

b.      Expressed her opinion that Officer Bolen was giving James an attitude and acting negatively towards her; and

c.      Expressed her opinion that Council and the police officers involved in the September 9 events were attempting to use the events of September 9 against James because James had exposed Holloway and ever since James exposed Holloway, Council and the police have been "coming for" James.

45.     On September 15, 2021, on Captain Bolen's petition, Union County Superior Court ordered the body-worn camera footage's release to the public.

-10-

46.     The City immediately published the entire body cam footage—including footage depicting James's minor son and James's receipt of medical treatment at a hospital—on its YouTube page.

## IV.    The City Retaliates against James violating her First Amendment Rights.

### A.     The City Censures James

47.     On September 28, 2021, the Council approved by 5-2 vote a Resolution of Censure for Council Member Angelia Nikole James, R-2021-76 (the "Censure"). Then-City Council members Gordon, Holloway, Kilgore, Anthony, and Keziah voted to adopt the Censure.[4]

48.     The Censure made numerous fact findings concerning the events of September 9.  It likewise concluded that James's conduct violated the Council's Code of Ethics.  The Censure concludes with: "[T]he City Council . . . hereby censures Council Member Angelia Nikole James for her conduct on, during, and after September 9 and 10, 2021, and condemns her actions in the strongest possible terms as not meeting the standards expected of members of the City Council and leaders of the City of Monroe."

49.     The Censure would not, however, be enough.  On October 20, 2021, Tee Leitner, a Monroe attorney, sent a letter to the City on behalf of five police officers—Officer Broome, Sergeant Craig, Lieutenant Brummer, Captain Bolen, and Officer

---

[4] The September 28, 2021 meeting minutes are attached hereto as Exhibit C.

Aycoth. In the letter, Mr. Leitner demanded the City "investigate" James. The letter made no specific monetary demand but threatened the City with a lawsuit.

50. The Leitner letter enclosed human resources complaints filed by four of the five officers. Those complaints accused James of, among other things, hate speech and racist behavior. For example:

    a. Officer Broome claimed that James "was discriminating [against] me for my skin color because of where I live and where I attended high school." According to Broome, this discrimination took the form of James telling Broome she was "uppity," that she needed to "fix her face," that she had poor body language, and that "just because you went to Weddington [High School] doesn't mean nothing."

    b. Captain Bolen complained that "James used her title and position to harass me and call me a racist." He also accused James of assaulting him by trying to take his police badge (Bolen, a seasoned police veteran, did not charge James with assault on September 9 and has not attempted to take criminal charges out against James since September 9).

    c. Sergeant Craig accused James of exhibiting racist behavior not just on September 9, but in interviews and press conferences with news media after September 9, including a September 16 press conference and a September 17 interview with "Fox Charlotte." James's racist behavior, according to Craig, primarily took the form of James accusing the police officers of being racist—

-12-

his complaint says: "Councilwoman James has obvious bias against people based on the color of their skin."

**B.    The City Initiates the Amotion Proceedings against James**

51.    The City did not stop with the Censure. During its November 9, 2021 meeting,[5] the Council adopted by 4-2 vote a Resolution of City Council of City of Monroe, North Carolina, to Direct Issuance of a Petition in Amotion to Council Member Angelia Nikole James, R-2021-89 (the "Amotion Resolution").[6]

52.    Before Council's vote, Gordon stated that:

    a.    "James had not apologized for her words or actions and only apologized for her unprofessional behavior before Council censured her."

    b.    "James did not apologize to anyone at the Union County Health Department who she denounced who were just doing their job."

    c.    "Council Member James did not apologize to Superior Court Judge Jonathan Perry or Attorney Tee Leitner."

53.    Gordon further chastised James for her failure to "be accountable," and for "attacking the employees, colleagues, other elected officials, the citizens or the people for work with the City of Monroe."

54.    Finally, Gordon noted that "today, instead of showing any remorse, Council Member James used social media to demand that her supporters come in

---

[5] The minutes of the Council's meeting on November 9, 2021 is attached hereto as Exhibit D.

[6] The Amotion Resolution is attached hereto as Exhibit E.

-13-

today to speak to Council so that 'we are NOT having CONTROL in our City.'"
(emphasis in original).

55.     Apparently, James's post-September 9 speech warranted, in Gordon's
view, the initiation of proceedings to remove her from office.

56.     The Council shared that view.   In the Amotion Resolution, Council
directed the City Attorney, in preparing the Amotion Petition, "to ensure that the
petition incorporates information related to the September 9-10, 2021 incidents
involving Council Member James, as well as issues related to Covid-19 that the City
became aware of on September 14, 2021, press conferences involving Council Member
James following the September 9-10, 2021 incidents, claims raised by members of the
City of Monroe Police Department on or before October 20, 2021."

57.     Council based its decision to initiate amotion proceedings against James
on its disagreement with statements James made to the press, including statements
concerning improper conduct by City officials, as well as on James's supposed failure
to apologize for her September 9th conduct.

58.     Council initiated amotion proceedings in retaliation for James's
protected speech, including James's statements to news media about misconduct of
City and Union County officials, James's refusal to apologize in the manner that
Council wanted, and James's attempts to encourage her supporters to express their
disagreement with the Council's response to the September 9 events.

-14-

59.     The U.S. Constitution's First and Fourteenth Amendment and Section 14 of Article I of the N.C. Constitution prohibit retaliation by government actors for a citizen's exercise of the right to free speech.

60.     James, both in her capacity as an elected official and in her individual capacity, enjoys free speech rights secured by the federal and state constitutions.

61.     Council's initiation of removal proceedings injured James—it forced her to defend claims she should have never needed to defend in a proceeding to which she should have never needed to be a party—in retaliation for James's protected speech.

62.     The initiation of removal proceedings, including but not limited to forcing an individual to defend their speech at a public evidentiary hearing, would chill a person of ordinary firmness from exercising their free speech rights.

## V.     The Amotion Proceedings violated James's First Amendment Rights

63.     On December 13, 2021, the City adopted the City of Monroe Rules of Procedure for Amotion Hearing (the "Amotion Rules").[7]

64.     The Amotion Rules split the amotion proceedings into two phases: an evidentiary hearing ("Phase I") and a Council vote ("Phase II").

65.     A Hearing Officer's was appointed to preside like a judge over the Phase I evidentiary hearing, and outside counsel prepared and prosecuted the amotion petition, presenting evidence in support of James's removal.

### A.     Phase I: the Evidentiary Hearing.

---

[7] The minutes of the Council's meeting on December 13, 2021 is attached as Exhibit F.

-15-

66.     The Phase I evidentiary hearing before the Hearing Officer commenced on January 27, 2022 with counsels' opening statements.

67.     During the evidentiary hearing, MPD officers Chief Gilliard, Officer Birchmore, Sergeant Craig, Lieutenant Brummer, Officer Aycoth, and Captain Bolen testified about the September 9 events.

68.     All the police officers who testified at the evidentiary hearing testified that they knew that James could not hire, fire, promote, or demote them, except for Officers Birchmore and Aycoth who, incredibly, claimed not to know whether James could hire or fire them.  Those officers acknowledged, however, that they had read and signed the City's employee handbook (which contains provisions concerning the supervision of City employees).  Officer Aycoth likewise acknowledged that in his eight years on the force he could not think of a time that Council ever hired or fired a police officer.

69.     As multiple officers testified, James had no power or authority to direct them in any way.  Those officers refused James's demands on numerous occasions. To the extent the officers complied with James's direction, they did so as a courtesy.

70.     The hiring, firing, promotion, and demotion of police officers in the City involves a multi-stage process with which the officers that responded on September 9 are all familiar.  That process does not include the involvement in any capacity of any member of the Council.

71.     James's office does not involve directing or supervising police activity.

-16-

72.     James could not, of course, hire, fire, demote, or promote any police officer on September 9, 2021. That is true not just because James, as an individual member of Council, lacked the power to unilaterally take any official action on the part of Council whatsoever, but also because Council does not hire, fire, promote, or demote City employees, except for the three employees that they appoint directly (i.e., the City Manager, City Attorney, and City Clerk). The hiring or firing of police officers is simply not part of the duties of a City Councilmember.

73.     And of course, none of the police officers who James supposedly fired, replaced, promoted, or demoted were fired, replaced, promoted, or demoted by James.

74.     The evidentiary hearing concluded on January 28, 2022 with counsels' closing statements.

75.     The Hearing Officer then issued her report (the "Report") on March 25, 2022.[8]

**B.     Phase II: Council's Vote**

76.     Phase II occurred on April 7, 2022 at an open meeting of the Council. That meeting included presentations by the Hearing Officer, the City's outside counsel, and James's counsel.[9] It ended in a 6-0 vote in favor of James's removal without any deliberation.[10]

_____

[8] The Hearing Officer's Report is attached as Exhibit G.

[9] The transcript of the April 7, 2022 Phase II Hearing before Council is attached hereto as Exhibit H.

[10] The City Council Order removing James is attached hereto as Exhibit I.

-17-

77.     First, James was excused from voting by a majority vote of the Council and after James was excused, the Hearing Officer presented the Report.

78.     Reading from a script, Gordon moved to adopt the findings and conclusions of the Report. Gordon's motion passed 6-0.

79.     The Council determined that James should be removed because of her statements to Chief Gilliard that he should retire, and statements to Officer Broome concerning her attitude, body language, and high school. Those statements comprise the expression of constitutionally protected opinions.

80.     The Council determined that James's should be removed because of her statements to officers that they were going to be promoted, demoted, or fired at some point in the future. Those statements comprise the expression of constitutionally protected opinions, or of the intent to express constitutionally protected opinions at some point in the future (i.e., to discuss the firing or demotion of officers with others within the City government).

81.     The Council determined that James should be removed because of her statements to officers that they had been fired, promoted, or demoted. James cannot hire, fire, or promote any officer. At the most, her statements to those officers were statements of opinions concerning what should happen with their jobs, and those statements are of public concern, and constitutionally protected.

82.     Then, Gordon moved to remove James from office. That motion passed 6-0.

83. In this fashion, six white Councilmembers removed the only black member of the Council from office more than eighteen months before the end of her term.

84. The threat of or actual removal from elected office would chill a person of ordinary firmness from exercising their free speech rights.

85. Council removed James to punish her for statements she made to or about the City police and City officials on or after September 9.

86. Council removed James because she was a black person who had the audacity to challenge white public officials.

87. James's removal, and the removal proceedings themselves, violated James's fundamental rights to free speech, equal protection, and procedural due process.

## VI. The City violated James's Equal Protection Rights.

88. James incorporates the above allegations herein by reference.

89. James is a black woman.

90. All the Councilmembers who voted to initiate amotion proceedings against James are white.

91. All the Councilmembers who voted to remove James are white.

92. All the police officers that publicly released complaints of James's conduct on September 9, 2022, are white.

-19-

93. In their complaints, those officers accused James of racist behavior. The officers' accusations—that James discriminated against them for being white—are inherently premised on James being black.

94. The amotion proceedings were initiated based in part on the officers' complaints.

95. Roughly nine years ago, the Council hired Parker Poe Adams and Bernstein, LLP, to conduct an "independent analysis of the relationship between the Mayor, the Council, the City Manager's office and senior staff of the City of Monroe" (the "Parker Poe Report"). The Parker Poe Report issued on January 31, 2013. It found that the Council had engaged in widespread and pervasive acts of nepotism, abusive conduct toward staff, and the exercise of influence over personnel decisions. The Parker Poe Report noted, specifically, that "[t]hree individual Council members, particularly Dottie Nash, Mayor Bobby Kilgore, and Lynn Keziah, have influenced personnel decisions with respect to staff hiring and discipline."

96. Nash, Kilgore, and Keziah, are white.

97. The Council never removed Nash, Kilgore, or Keziah from office.

98. The Council never initiated removal proceedings against Nash, Kilgore, or Keziah.

99. The Council never censured Nash, Kilgore, or Keziah.

100. Nash, Kilgore, and Keziah were persons similarly situated to James. They engaged in conduct similar to, and if anything, worse than, James's supposed

-20-

misconduct, as their conduct had actual effects on the personnel decisions of the City. James's conduct had no effect on anything.

101. Kilgore and Keziah voted to initiate removal proceedings against James.

102. Keziah voted to remove James.

103. The incidents involving Nash, Kilgore, and Keziah are not the only instances of white Councilmembers (or other white officials, including members of the City's public boards) behaving badly. In fact, the City, both before and following James's removal, has tolerated much worse behavior on the part of members of its Council. Rather than removing white members that have engaged in such conduct, the Council opted for censures or, in many instances, did nothing at all.

104. The Council treated James differently because she is black, because her supposed misconduct involved insulting and offending white police officers, and because, as a black woman, she had the audacity to accuse members of Monroe police officers and Union County officials of racist behavior.

105. The Fourteenth Amendment to the U.S. Constitution and Section 19 of Article I of the N.C. Constitution prohibit race-based discrimination in government, unless the discrimination is shown to serve a compelling government interest in a narrowly tailored manner.

106. James was denied the equal protection of the law when Council voted to initiate removal proceedings against her and voted to remove her due to her race.

107. Such action did not serve any compelling government interest.

-21-

108. Such action was not narrowly tailored to serve any compelling government interest.

CLAIM I – 42 U.S.C. § 1983 (FREE SPEECH)

109. James incorporates the above allegations by reference.

110. Section 1983 of Title 42 of the U.S. Code provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."

111. The City has, acting under color of law, deprived James of her fundamental and substantive due process right to free speech under the Fourteenth Amendment to the U.S. Constitution by (A) initiating removal proceedings and (B) voting to remove James from elected office in retaliation for James's constitutionally protected speech.

112. Defendant's actions to deprive James of her right to free speech were done intentionally and with malice.

113. As a direct and proximate result of such deprivation, James has suffered damages in an amount to be determined at trial and is entitled to recover punitive damages from the City pursuant to Chapter 1D of the N.C. General Statutes.

CLAIM II – 42 U.S.C. § 1983 (FREE SPEECH – OVERBREADTH)

114. James incorporates the above allegations by reference.

-22-

115.    Section 160A-86 of the N.C. General Statutes requires cities "to adopt a resolution or policy containing a code of ethics to guide actions by the governing board members in the performance of the member's official duties as a member of that governing board." N.C. Gen. Stat. § 160A-86(a).

116.    Section 160A-86(b) requires a city's code of ethics to address, at a minimum:

a.    The need to obey all applicable laws regarding official actions taken as a board member.

b.    The need to uphold the integrity and independence of the board member's office.

c.    The need to avoid impropriety in the exercise of the board member's official duties.

d.    The need to faithfully perform the duties of the office.

e.    The need to conduct the affairs of the governing board in an open and public manner, including complying with all applicable laws governing open meetings and public records. N.C. Gen. Stat. § 160A-86(b)(1)-(5).

117.    On December 7, 2010, the City adopted its Code of Ethics as policy number GA-13, (the "Code").

118.    The Code goes significantly farther than the minimum requirements of Section 160A-86. For example, the Code lists a set of behaviors "consistent with" the requirement that "Council Members should act with integrity and independence from improper influence," including:

-23-

a. "Adhering firmly to a code of sound values;"

b. "Behaving consistently and with respect toward everyone with whom they interact;"

c. "Exhibiting trustworthiness;"

d. "Living as if they are duly elected officials regardless of where they are or what they doing [sic];"

e. "Using their best independent judgment to pursue the common good as they see it, presenting their opinions to all in a reasonable, forthright, consistent manner;"

f. "Treating other Council Members and the public with respect and honoring the opinions of others even when Council Members disagree with those opinions;"

g. "Showing respect for their offices and not behaving in ways that reflect badly on those offices;" and

h. "Recognizing that they are part of a larger group and acting accordingly."

119. The Code likewise purports to require Councilmembers to "act as the especially responsible citizens whom others can trust and respect" and to "set a good example for others in the community."

120. A violation of the Code can result in a Councilmember's removal from office.

121.    The Code regulates a wide variety of constitutionally protected speech. Like private citizens, City Councilmembers have the right to express their views on a wide variety of public issues, regardless of whether such expression may be, for example, disrespectful to other Councilmembers, City employees, or the public.

122.    To the extent the Code serves any compelling governmental interest, it is not narrowly tailored to serve that interest.    The Code goes well beyond the requirements of state law to essentially prohibit disrespectful speech or expressive conduct.    The Code even purports to regulate the manner in which Councilmembers may present their opinions.    *Cf.* (requirement that Councilmembers "present[] their opinions to all in a reasonable, forthright, and consistent manner").

123.    The overbreadth of the Code would chill a person of ordinary firmness from exercising his or her free speech rights as a City Councilmember.

124.    Because the Code is substantially overbroad, it could not lawfully form the basis for the initiation of removal proceedings against James or James's actual removal.

125.    The enforcement of the Code subjected James to amotion proceedings that culminated in her removal from elected office and deprived James of her rights to free speech under the First and Fourteenth Amendments to the U.S. Constitution.

126.    As a direct and proximate result of such deprivation, James has suffered damages in an amount to be determined at trial.

### CLAIM III – 42 U.S.C. § 1983 (DUE PROCESS – VAGUENESS)

127.    James incorporates the above allegations by reference.

-25-

128.  The Due Process Clause of the Fourteenth Amendment prohibits the enforcement of laws that either forbid or require the doing of an act in terms so vague that people of common intelligence must necessarily guess at their meaning and differ as to their application.

129.  The Amotion Petition accused James of failing to "behav[e] consistently and with respect toward everyone with whom [she] interact[ed]," failing to "act as the especially responsible citizen[] whom others can trust and respect," and failing to "set a good example for others in the community."  The Hearing Officer cited these provisions of the Code in her report, and the Council's order removing James cited those provisions as well. Both the Hearing Officer and the Council concluded that James's violation of the Code was grounds for removal from office.

130.  A person of common intelligence can only guess at the meaning of the requirement that a Councilmember "behave consistently and with respect," "act as the especially responsible citizen," and "set a good example" for others.  Those provisions defy objective definition; their interpretation and enforcement are entirely at the whim of the subjective viewpoint of the persons charged with their application.

131.  Since a person of ordinary intelligence does not have a reasonable opportunity to know what conduct these provisions of the Code prohibit, the Code is unconstitutionally vague.

132.  The Code is also unconstitutionally vague in that it fails to provide explicit standards for those who apply the law and, as a result, the Code authorizes or encourages seriously discriminatory enforcement.

133. The enforcement of the Code subjected to James to removal proceedings that culminated in her removal from elected office and deprived James to her due process rights and James suffered damages as the result of such deprivation in an amount to be determined at trial.

## CLAIM IV – 42 U.S.C. § 1983 (EQUAL PROTECTION)

134. James incorporates the above allegations by reference.

135. The City has, acting under color of law, deprived James of her rights to equal protection under the Fourteenth Amendment to the U.S. Constitution by initiating removal proceedings and voting to remove James because James is black.

136. Defendant's actions to deprive James of her right to equal protection were done intentionally and with malice.

137. As a direct and proximate result of such deprivation, James has suffered damages in an amount to be determined at trial and is entitled to recover punitive damages from the City pursuant to Chapter 1D of the N.C. General Statutes.

## PRAYER FOR RELIEF

WHEREFORE, James respectfully prays the Court award her the following relief:

1. A trial by jury as to all issues so triable;

2. Compensatory damages from Defendant in an amount to be determined at trial;

3. Punitive damages to the extent the law allows;

4. That James recover her reasonable attorney's fees and costs;

-27-

5.   Any other relief the Court deems just and proper.

This 30th day of October, 2024.

Respectfully,



By:   /s/ Bo Caudill
      Bo Caudill
      N.C. Bar No. 45104
      bocaudill@villmercaudill.com
      Sophia M. M. Pappalardo
      N.C. Bar No. 56743
      sophiapappalardo@villmercaudill.com
      VILLMER CAUDILL, PLLC
      P.O. Box 18186
      Charlotte, NC 28218
      Tel: 704-216-8120
      Fax: 704-705-8191
      *Counsel for Plaintiff James*

-28-